Michael HUBBARD, Petitioner,

v.

MERIT SYSTEMS PROTECTION BOARD, Respondent,

and

Environmental Protection Agency, Intervenor.*

No. 99–3029.

United States Court of Appeals, Federal Circuit.

March 3, 2000

Rehearing and Rehearing En Banc Denied May 10, 2000.

Stephen M. Kohn, National Whistleblower Legal Defense and Education Fund, argued for petitioner. With him on the brief was David K. Colapinto.

---

* The caption has been reformed to show the Merit Systems Protection Board as the respondent. *See Costello v. Merit Systems Protection Board,* 182 F.3d 1372 (Fed.Cir.1999).

Michal L. Tingle, Attorney, Commercial Litigation Branch, Civil Division, of Washington, DC, argued for respondent. With him on the brief were David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director; and Kirk T. Manhardt, Assistant Director.

Eric D. Flores, Attorney, Office of the General Counsel, Merit Systems Protection Board, of Washington, DC, argued for intervenor. With him on the brief were Mary L. Jennings, General Counsel; and Martha B. Schneider, Assistant General Counsel.

Before RADER, Circuit Judge, FRIEDMAN and ARCHER, Senior Circuit Judges.

FRIEDMAN, Senior Circuit Judge.

The principal question in this case is whether the Merit Systems Protection Board ("Board") correctly held that it lacked authority to award back pay for the period between the Environmental Protection Agency ("EPA")'s wrongful refusal to hire the petitioner Hubbard and its hiring of him eleven years later pursuant to court order. Another question is whether the Board erroneously refused to order nonmonetary relief. We affirm.

I

A. In 1982, Hubbard applied to the EPA for a position as a criminal investigator. The EPA did not hire him because, as the district court found, it had been told that while working as a detective for the District of Columbia Metropolitan Police, he had revealed to the press and to a member of Congress information about the police department's Capitol Hill drug investigation.

Hubbard sued the EPA in the United States District Court for the District of Columbia, seeking instatement and back pay. The court ruled that the EPA had violated Hubbard's First Amendment rights in refusing to hire him. The court ordered him instated in the position, but denied him back pay or money damages and did not make the order retroactive.

*See Hubbard v. EPA,* 735 F.Supp. 435, 440–41 (D.D.C.1990); *Hubbard v. EPA,* 739 F.Supp. 654, 657 (D.D.C.1990) (modifying original order).

The Court of Appeals for the District of Columbia Circuit affirmed. *See Hubbard v. EPA,* 982 F.2d 531 (1992) (en banc). In denying Hubbard back pay, the court held that the waiver of sovereign immunity in the Administrative Procedure Act for "relief other than money damages," 5 U.S.C. § 702, does not cover back pay.

EPA then hired Hubbard for the criminal investigative position he had sought, effective March 8, 1993, but declined to give him back pay to the time when it originally rejected him.

B. In May 1994, the Office of Special Counsel, on Hubbard's behalf, filed a complaint with the Board, seeking monetary relief under the Back Pay Act, 5 U.S.C. § 5596, and the Civil Service Reform and Whistleblower Protection Acts, 5 U.S.C. §§ 1214(b)(4)(A), (g), and 2302(b)(11). The complaint alleged that the EPA's refusal to hire Hubbard violated his First Amendment rights and constituted a "prohibited personnel practice" under the Civil Service Reform Act, 5 U.S.C. § 2302(b)(11), that the Board could remedy. Hubbard intervened in the proceeding. He sought the additional relief of EPA posting notices both nationally and regionally acknowledging its commission of a prohibited personnel practice and stating the agency's commitment to a work environment free of such practices, and a cease and desist order.

The Civil Service Reform Act prohibits personnel actions, including "appointment[s]," *see* 5 U.S.C. § 2302(a)(2)(A)(i), "if the taking of or failure to take such action violates any law, rule, or regulation implementing, or directly concerning, the merit system principles contained in section 2301." 5 U.S.C. § 2302(b)(11). Section 2301 provides in pertinent part that "[f]ederal personnel management should be implemented consistent with the following merit system principles: ... (2) All

... applicants for employment should receive fair and equitable treatment in all aspects of personnel management ... with proper regard for their ... constitutional rights." 5 U.S.C. § 2301(b)(2). The Act also authorizes the Board to take "corrective action" if it finds that a prohibited personnel practice occurred. See 5 U.S.C. § 1206(c)(1)(B) (1988). ·

In 1989, in the Whistleblower Protection Act, Pub.L. No. 101–12, §§ 3(a)(8), 11, 103 Stat. 16, 18, 19 (1989), Congress replaced section 1206(c)(1)(B) with a new section 1214, which, similar to its predecessor, gave the Board authority to "order such corrective action as the Board considers appropriate, if the Board determines that the Special Counsel has demonstrated that a prohibited personnel practice ... has occurred." 5 U.S.C. § 1214(b)(4)(A). Section 1214 was further amended in 1994 to add a new subsection (g), which provides that "corrective action under this section ... may include– (1) that the individual be placed, as nearly as possible, in the position the individual would have been in had the prohibited personnel practice not occurred; and (2) ... back pay and related benefits ... and any other reasonable and foreseeable consequential damages." 5 U.S.C. § 1214(g).

The Board concluded that the EPA had committed a "prohibited personnel practice" by refusing to hire Hubbard, but that neither the Back Pay Act, nor the relief provisions in 5 U.S.C. § 1214 authorized it to grant the monetary relief requested. See Special Counsel v. EPA, 79 M.S.P.R. 542, 555 (1998). The Board held that the Back Pay Act applies only to employees and former employees and not to applicants for employment. See id. at 547.

Treating Hubbard's claim as one for money damages under section 1214, the Board concluded it had no authority to make such an award in this case. First, the Board held that 5 U.S.C. § 1214(g), which in 1994 authorized the Board to award back pay and consequential damages, does not cover conduct before its enactment, because it "conferred a new right to monetary relief," which "[i]f applied retroactively ... would attach new legal consequences to conduct that took place before its enactment." See id. at 550. Second, the Board held that prior to 1994, it had no authority to award money damages in corrective action cases. See id. at 550. The "corrective action" provision of 5 U.S.C. § 1214(b)(4)(A), the Board reasoned, "does not constitute a clear unequivocal waiver of sovereign immunity that would permit [it] to award money damages in corrective action cases." Id. at 551.

Finally, the Board denied Hubbard's request for non-monetary relief, noting that "the case involves actions that occurred over fifteen years ago" and that "the requested posting and cease and desist order would serve no useful purpose under these circumstances." Id. at 555–56 n. 8.

In this appeal Hubbard does not challenge the Board's rulings (1) that the Back Pay Act covers only present and former employees, not applicants for employment, and (2) that section 1214(g) does not apply retroactively. He contends only (1) that the Board's authority in section 1214(b)(4)(A) to take "corrective action" constituted a waiver of the government's sovereign immunity and authorizes the Board to award back pay and (2) that the Board erred in refusing to provide the non-monetary relief he sought.

## II

■ The Board correctly held that its statutory authority to "order corrective action" to remedy a prohibited personnel practice did not constitute a waiver of sovereign immunity that would permit it to award back pay covering the period for which Hubbard had improperly been denied employment. "A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text, and will not be implied. Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sover-

eign. To sustain a claim that the Government is liable for awards of monetary damages, the waiver of sovereign immunity must extend unambiguously to such monetary claims. A statute's legislative history cannot supply a waiver that does not appear clearly in any statutory text; the unequivocal expression of elimination of sovereign immunity that we insist upon is an expression in statutory text." *Lane v. Pena*, 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996) (internal citations and quotation marks omitted).

Here, as in *Lane*, "[t]he clarity of expression necessary to establish a waiver of the Government's sovereign immunity against monetary damages for [prohibited personnel practices] is lacking in the text of the relevant provisions." *Id.* The phrase "order corrective action" does not specifically provide for, or even suggest the payment of monetary compensation. It is a general term that, as the Board stated, "is not specific enough to itself constitute a clear waiver of sovereign immunity." *Special Counsel v. EPA*, 79 M.S.P.R. at 551.

> Hubbard contends that
>
> the Board erred when it analyzed the portion of the CSRA authorizing "corrective action" in isolation to the other aspects of the law which clearly and unequivocally demonstrated that corrective action applied to "applicants" for employment, such as Mr. Hubbard, and authorized the correction of *any* "decision concerning pay."

He notes that the statute applies to "applicants for employment," *see* 5 U.S.C. § 2301(b)(2), and that the definition of "prohibited personnel practice" includes "decision[s] concerning pay," *see* 5 U.S.C. § 2302(a)(2)(A)(ix). He argues that, "[u]nder a plain meaning of the statute, 'corrective action' authorized the Board to 'correct' a 'personnel action' impacting an 'applicant' for employment related directly to a 'decision concerning pay.'" Thus, he contends that the EPA's decision not to hire him was a prohibited "decision concerning pay," for the correction of which by a monetary award Congress waived sovereign immunity.

Although the argument is ingenious, it is unconvincing. The provisions upon which he relies define the particular personnel actions over which the Board has jurisdiction, not the remedies that Congress authorized the Board to employ. Moreover, although the definition of "prohibited personnel action" includes "decisions concerning pay," it also includes those concerning "an appointment." 5 U.S.C. § 2302(a)(2)(A)(i). The question is whether Congress waived sovereign immunity to permit the Board to order payment of damages for the agency's improper initial refusal to appoint Hubbard. The prohibited personnel actions falling under the statutory term "decision concerning pay" involve such questions as the proper pay level for particular jobs, the calculations of the amount of pay, etc., rather than the award of back pay as a remedy for the erroneous decision refusing to give Hubbard an appointment in 1982.

When Congress intended to waive sovereign immunity to permit the Board to award monetary compensation, it knew how to, and did do so clearly and unequivocally. In the 1994 amendments of section 1214, Congress expanded the definition of "corrective action" to "include ... reimbursement for attorney's fees, back pay and related benefits, medical costs incurred, travel expenses, and any other reasonable and foreseeable consequential damages." 5 U.S.C. § 1214(g)(2).

Hubbard argues that the 1994 amendment was intended only to clarify, but not to change existing law. The addition of the numerous kinds of monetary payments to the definition of "corrective action," however, significantly enhanced and changed the Board's authority. Contrary to Hubbard's contention, the legislative history of that amendment does not show that it merely clarified, but did not expand, the Board's existing authority. The Senate Committee on Governmental Affairs described the new section as "*allow[ing]*

the Board to order corrective action that will make, as nearly as possible, the individual 'whole.' " S.Rep. No. 103–358, at 11 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3549, 3559 (emphasis added). The use of the word "allow" strongly suggests that Congress intended to give the Board remedial power it did not previously possess.

Hubbard contends, however, that the Court of Claims decision in *Goodwin v. United States,* 127 Ct.Cl. 417, 118 F.Supp. 369 (1954), establishes that "Congress intended to include back pay in its definition of corrective action." In *Goodwin,* a veteran had been demoted in his federal government employment. After it was determined that his demotion was improper and he was reinstated to his formerly held higher grade, he filed suit in the Court of Claims under section 14 of the Veterans Preference Act of 1944, 5 U.S.C. § 863 (1954), to recover the pay he had lost as a result of his demotion. That section provided that if the Civil Service Commission (the Board's predecessor) determined that the veteran had been improperly demoted, it would direct the administrative officer in the agency that demoted the veteran to take such "corrective action" as the Commission recommended. In *Goodwin,* the Commission recommended that the veteran "be restored to his former rank as of ... the date of his reduction in grade. Compliance with that recommendation would have required that the Naval Shipyard pay the plaintiff the wages he lost because of his demotion, back to the date of his demotion." 118 F.Supp. at 370.

Although the actual holding in the case was that the statute of limitations did not bar the veteran's claim, the court also ruled that the "corrective action" the Commission was authorized to recommend included back pay: "When Congress authorized the Civil Service Commission to hear the demoted veteran's appeal and recommend to the employing agency correction of its treatment of him, it could not have been unaware that the most important element of relief for wrongful demotion, next to restoration to his former status, was back pay." *Id.* at 371. *See also Smith v.*

*United States,* 127 Ct.Cl. 706, 119 F.Supp. 200, 201 (Ct.Cl.1954); *Fischer v. Haeberle,* 80 F.Supp. 652, 656 (E.D.N.Y.1948); *Wettre v. Hague,* 74 F.Supp. 396, 399 (D.Mass. 1947), *rev'd on other grounds,* 168 F.2d 825 (1st Cir.1948).

In its opinion, the Court of Claims did not discuss, or even refer to, any issue of sovereign immunity, and it is uncertain from the opinion whether the government even raised that defense. The court focused on whether the statutory phrase "corrective action" included back pay and the court ruled that it did. *Goodwin* cannot be read as holding that in the Veterans Preference Act Congress waived sovereign immunity for back pay.

Hubbard's argument seems to be that *Goodwin* established that when Congress uses the phrase "corrective action," it not only covers back pay but also waives sovereign immunity for it. He asserts that when Congress authorized the Board to take "corrective action," those words had a well established meaning that included back pay. That term, however, is a generic phrase that appears repeatedly throughout the United States Code in greatly varying contexts. *See, e.g.,* 16 U.S.C. § 1606(e); 17 U.S.C. § 119(a)(5)(A)(i); 19 U.S.C. § 1509(f)(2)(F). Hubbard has not shown that Congress's use of the term in the legislation here involved expressed a clear and unequivocal intent to waive sovereign immunity.

### III

■ Hubbard further contends that the Board erred in denying the additional nonmonetary relief he sought—the posting by EPA of notices admitting its misconduct and a cease and desist order.

In denying this additional relief the Board, "assuming" it had the authority to take such action, "den[ied] the request for the following reasons":

> [T]he request came from the intervenor, not the petitioner, which is the agency charged with bringing actions before the Board to correct prohibited personnel

practices. Further ... the case involves actions that occurred over fifteen years ago and have been the subject of numerous published court decisions in which intervenor ultimately prevailed.... [T]he requested posting and cease and desist order would serve no useful purpose under these circumstances. Moreover, there has been no allegation or showing that the prohibited conduct has continued into the present. A cease and desist order would therefore be redundant and unnecessary.

*Special Counsel v. EPA*, 79 M.S.P.R. at 555–56 n. 8.

The Board may "order such corrective action as the Board considers appropriate." 5 U.S.C. § 1214(b)(4)(A). "Words such as 'may' and 'consider appropriate' show a clear Congressional intent to provide the Board with broad discretion in the type and scope of the corrective action ordered, if any." *In re Frazier*, 1 MSPB 159, 1 M.S.P.R. 163, 198 (1979) (footnotes omitted), *aff'd sub nom. Frazier v. MSPB*, 672 F.2d 150 (D.C.Cir.1982). The Board did not abuse its discretion in denying this additional relief that Hubbard sought.

The fact that the Special Counsel did not seek such relief is significant. As the Board noted, the Office of Special Counsel, not Hubbard, is the entity charged with seeking "corrective action" against prohibited personnel practices; it "is fundamentally concerned with the integrity of the merit system" and responsible "to vindicate the public interest." *Frazier*, 672 F.2d at 162–63. The fact that the violations occurred more than fifteen years earlier supports the Board's conclusion that "the requested posting and cease and desist order would serve no useful purpose." Although Hubbard refers to three more recent cases in which he alleges the EPA violated the First Amendment rights of its employees, there is no showing that those cases are comparable to the present one. This case arose out of an isolated incident many years ago, and there is no indication of any real likelihood of its repetition.

## CONCLUSION

The decision of the Merit Systems Protection Board denying monetary compensation and other non-monetary relief is

*AFFIRMED.*